APR 30 2026 PM12:13
FILED - USDC - FLMD - JAX

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**VINCENT McCRUDDEN,**
*Plaintiff,*

v.

**APEX TRADER FUNDING, INC., a Texas corporation;**
**DARRELL ROLAND MARTIN, individually;**
**BRYAN WIRTH, individually;**
**JOHN MARK SKELTON, individually;**
**ANTHONY TODD JOHNSON, individually;**
**DANIEL COOK, individually;**
**CHRIS MANNING, individually;**
**CAMERON NISH, individually;**
**ZACHARIAH LEDESMA, individually;**
**VINCE KOEHN, individually; and**
**CALVIN JOHNSON, individually,**
*Defendants.*

Case No.: 3:26-cv-1073-WWB-SJH

**JURY TRIAL DEMANDED**

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S COMPLAINT

## I. PRELIMINARY STATEMENT

Plaintiff Vincent McCrudden ("Plaintiff" or "Mr. McCrudden"), a twenty-five-year veteran of the financial services industry who has held Securities Series 3, 4, 7, 24, 55, and 63 licenses, brings this action against Apex Trader Funding, Inc. ("Apex" or the "Company") and the officers and principals who directed, authorized, and implemented the scheme described herein (collectively, the "Defendants").

This action arises from Defendants' systematic and deceptive scheme to extract subscription fees, commissions, exchange fees, and trading data from futures traders while employing an ever-shifting set of rules, restrictions, and pretextual account closures specifically

designed to prevent those traders from accessing funds they have legitimately earned. Defendants operate what is, in substance, an unregistered commodity pool—soliciting funds from thousands of traders, combining those funds in a master trading account, and trading futures on regulated exchanges—without registration as a Commodity Pool Operator ("CPO") with the Commodity Futures Trading Commission ("CFTC") or the National Futures Association ("NFA"), thereby evading the disclosure, reporting, and fiduciary obligations that such registration requires.

In Plaintiff's case, the scheme operated with particular brazenness. Plaintiff first opened a personal account with Apex (account APEX-89613) in or about October 2023, paying subscription fees, evaluation fees, and platform costs continuously over more than three years. In July 2025, Apex implemented a defective two-factor authentication ("2FA") system that locked Plaintiff out of his own account. Apex resolved that incident as a routine technical-support matter, refunded the evaluation fee, and closed the account. No disciplinary warning was issued, no Code of Conduct provision was cited, and no trading violation was identified.

In February 2026, Plaintiff opened a new account in the name of Pickleball Fanatics, LLC, a Florida limited liability company of which Plaintiff is the sole principal. Apex accepted the account through its own Know Your Customer ("KYC") verification process for a business entity—a higher bar of due diligence than individual account verification—and Apex's own support personnel consistently addressed correspondence to "Vincent" rather than to the LLC's business name. The KYC obligation runs at the moment of account opening, not retroactively at the moment of payout. Apex thus knew exactly who was behind the account and chose to accept the relationship, collect subscription fees, and permit trading without objection. Over two months, Pickleball Fanatics, LLC paid approximately $10,000 in subscription fees and passed multiple combine evaluations.

Plaintiff traded consistently and profitably over six trading days, building the Performance Account balance to $168,495.28—representing $18,495.28 in profits above the $150,000 starting balance. On April 10, 2026, Apex's own trading-progression system confirmed that every payout-eligibility criterion was satisfied: minimum balance met, five days above $300 met, minimum trading days met, consistency rule met at 36.26% (well under the 50% threshold), and status displayed as "Eligible" in green. Plaintiff has preserved a contemporaneous screenshot of that status from Apex's own customer interface.

Immediately after Plaintiff submitted the Pickleball Fanatics, LLC banking information to initiate the payout, Apex's Risk Department permanently closed the account, citing a vague reference to a year-old technical-support ticket (#987433) and an unspecified "Code of Conduct" violation—without identifying any specific provision violated or any specific conduct at issue. The timing was not coincidental. Apex did not close this account when it accepted Plaintiff's subscription fees. Apex did not close this account during the months Plaintiff was trading. Apex closed this account at the precise moment Plaintiff became payout-eligible and submitted banking information to receive funds. This is the hallmark of the fraudulent payout-denial scheme that Apex's own co-founder, John Mark Skelton, has described on recorded video.

On April 10, 2026, within hours of the closure, Plaintiff served a Litigation Hold and Evidence Preservation Notice on Apex and its principals, directing the immediate preservation of all potentially relevant evidence. Four days later, on April 14, 2026, when Plaintiff attempted to access his own account dashboard to preserve and document additional evidence, Apex displayed the message "Fraudulent Activity Detected" in red banner text and locked Plaintiff out of his own records. That post-litigation-hold conduct—branding Plaintiff as a fraudster on Apex's own platform after Apex had been formally noticed of pending litigation, and simultaneously denying him access to evidence within Apex's exclusive control—is independently actionable, supports an adverse inference at trial, and warrants sanctions under Federal Rule of Civil Procedure 37(e).

This Memorandum demonstrates that Defendants' conduct gives rise to claims for: (1) operation of an unregistered commodity pool in violation of the Commodity Exchange Act ("CEA"); (2) fraud and manipulation under the CEA; (3) breach of contract and the implied covenant of good faith and fair dealing; (4) fraudulent inducement; (5) violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"); (6) conversion; (7) unjust enrichment; (8) breach of fiduciary duty; (9) unconscionability; and (10) controlling-person liability under 7 U.S.C. § 13c(b).

## II. JURISDICTION AND VENUE

### A. Subject Matter Jurisdiction

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity of citizenship). Plaintiff is a citizen of the State of Florida, residing at 31 Flyer Circle, Saint Johns, Florida 32259. Defendant Apex Trader Funding, Inc. is a Texas corporation with its principal place of business at 2028 E. Ben White Blvd., Suite 240-9873, Austin, Texas 78741. Upon information and belief, each of the Individual Defendants is a citizen of a state other than Florida. Complete diversity of citizenship exists between Plaintiff and all Defendants. The amount in controversy exceeds $75,000, exclusive of interest and costs, based on Plaintiff's claims for compensatory damages including in excess of $50,000 in subscription, evaluation, and platform fees paid over more than three years on the original account, approximately $10,000 in fees paid on the Pickleball Fanatics, LLC account, $18,495.28 in seized trading profits, lost trading profits, consequential damages, and punitive damages.

This Court also has federal question jurisdiction under 28 U.S.C. § 1331 based on Plaintiff's claims arising under the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.*, including for operation of an unregistered commodity pool (7 U.S.C. § 6m), fraud (7 U.S.C. § 9(1); 17 C.F.R. § 180.1), and violations of NFA Compliance Rules. The Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367, as those claims arise from the same nucleus of operative facts.

**B. Personal Jurisdiction and Venue**

Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, including Plaintiff's execution of trading agreements, payment of subscription fees, conduct of trading activities, and receipt of Defendants' deceptive marketing. This Court has personal jurisdiction over all Defendants because they have purposefully directed their commercial activities toward Florida, including soliciting and entering into contracts with Florida residents, collecting subscription fees and commissions from Florida residents, and maintaining an ongoing commercial relationship with Plaintiff in this District.

**C. The Forum-Selection Clause Is Unenforceable**

To the extent Apex's Paid Funded Account Agreement (the "Agreement") contains a forum-selection clause, it is unenforceable. Although forum-selection clauses are presumptively

valid, the Supreme Court's framework in *Atlantic Marine Construction Co. v. U.S. District Court for the Western District of Texas*, 571 U.S. 49 (2013), "presupposes a contractually valid forum-selection clause." *Id.* at 62 n.5. Where the clause is not contractually valid—because of fraud, overreaching, unconscionability, or contravention of public policy—*Atlantic Marine* does not require its enforcement. Even in form contracts, forum-selection clauses are "subject to judicial scrutiny for fundamental fairness." *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991).

The Eleventh Circuit applies a four-factor test under which a forum-selection clause will be invalidated when: "(1) its formation was induced by fraud or overreaching; (2) the plaintiff would be deprived of its day in court because of inconvenience or unfairness; (3) the chosen law would deprive the plaintiff of a remedy; or (4) enforcement of the clause would contravene public policy." *Krenkel v. Kerzner Int'l Hotels Ltd.*, 579 F.3d 1279, 1281 (11th Cir. 2009); *see also Slater v. Energy Servs. Grp. Int'l, Inc.*, 634 F.3d 1326, 1331 (11th Cir. 2011); *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1290–91 (11th Cir. 1998); *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972) (foundational standard).

Each of the four *Krenkel* factors is satisfied here. *First*, the Agreement's formation was induced by overreaching. After Plaintiff completed Apex's evaluation process and earned profits through weeks of successful trading, Plaintiff was presented with the Agreement as a non-negotiable, take-it-or-leave-it condition of accessing capital he had already earned, with no opportunity to negotiate any term. *Second*, requiring a Florida resident proceeding pro se to litigate complex federal CEA claims and Florida statutory consumer-protection claims in Apex's chosen forum, against eleven defendants represented by counsel, would deprive Plaintiff of a meaningful day in court. *Third*, to the extent the chosen law would displace Florida's FDUTPA remedies, it would deprive Plaintiff of a remedy expressly conferred by the State of Florida on its residents. *Fourth*, enforcement would contravene the strong public policies of both (a) Florida, which has a manifest interest in applying FDUTPA to deceptive practices targeted at its residents, and (b) the federal government, in enforcing the CEA's anti-fraud and registration provisions against entities that solicit funds from U.S. retail traders. Plaintiff's federal statutory claims under the CEA also provide an independent basis for jurisdiction in this District.

**D. The Arbitration and Jury-Waiver Clauses Are Unconscionable and Unenforceable**

To the extent the Agreement mandates arbitration or purports to waive the right to a trial by jury, those clauses are unconscionable and unenforceable. While the Federal Arbitration Act establishes a general policy favoring arbitration, courts decline to enforce arbitration clauses that are unconscionable. *Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1133–35 (11th Cir. 2010).

**Procedural Unconscionability.** The Agreement is a classic contract of adhesion drafted entirely by Apex and presented on a take-it-or-leave-it basis to traders who have already invested substantial time and money in Apex's evaluation programs. The Agreement was executed under economic duress: after completing Apex's evaluation process and earning profits through trading, Plaintiff was presented with the Agreement as a non-negotiable condition of accessing capital he had already earned. No meaningful alternative was offered. No opportunity to negotiate terms was provided.

**Substantive Unconscionability.** Multiple provisions of the Agreement are independently unconscionable: (1) unlimited unilateral discretion to close accounts "under any provision" at any time; (2) the confidentiality clause requiring Trader to "keep this Agreement in whole or in part completely confidential or Trader shall forfeit their performance account and all payouts"; (3) the limitation-of-liability clause purporting to cap Apex's total liability at the amount paid by Trader; (4) the "no refunds" policy; and (5) Apex's reservation of the right to "revise policies and terms under this Agreement … at any time without notice."

Additionally, the arbitration clause cannot be enforced to compel arbitration of claims arising from Defendants' operation of an unregistered commodity pool, as such claims implicate federal regulatory violations that the arbitration clause was not designed to address and cannot lawfully insulate. *See Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 90 (2000). Plaintiff affirmatively demands trial by jury on all triable issues.

## III. THE PARTIES

### A. Plaintiff

Plaintiff Vincent McCrudden is an individual residing at 31 Flyer Circle, Saint Johns, Florida 32259. Mr. McCrudden is a twenty-five-year veteran of the financial services industry, with extensive experience as both a registered securities broker and futures trader. He has held

Securities Series 3, 4, 7, 24, 55, and 63 licenses. He is a citizen of the State of Florida. Mr. McCrudden is also the sole principal of Pickleball Fanatics, LLC, a Florida limited liability company through which the Apex trading account at issue was maintained. Mr. McCrudden is the lead plaintiff in *McCrudden v. TopstepFunded LLC, et al.*, Case No. 3:26-cv-00816-WWB-LLL (M.D. Fla.), now pending before this Court, asserting substantially similar claims against another prop-trading firm operating a substantially similar business model.

**B. Defendants**

**Apex Trader Funding, Inc.** ("Apex") is a Texas corporation with its principal place of business at 2028 E. Ben White Blvd., Suite 240-9873, Austin, Texas 78741. Apex operates a multi-tiered trading program marketed as providing traders the opportunity to earn funded trading accounts and receive payouts from trading profits. Apex also operates the Apex Investing Institute (founded 2008). Apex is not registered with the CFTC or NFA as a Commodity Pool Operator, despite operating what is, in substance, a commodity pool.

**Darrell Roland Martin** is the Founder and Chief Executive Officer of Apex Trader Funding, Inc. Martin exercises ultimate authority over Apex's business operations, marketing, trading programs, and the practices at issue in this action. Martin is named as a defendant in *Riot v. Apex Trader Funding Inc.*, No. 1:24-cv-01557 (W.D. Tex.). Martin is named individually for his direct participation in the design, implementation, and enforcement of the deceptive practices described herein.

**Bryan Wirth** is the Chief Technology Officer of Apex Trader Funding, Inc. Wirth is responsible for the technology infrastructure that facilitates Apex's trading operations, including the account-management systems, trading platforms, and the dashboard systems that displayed Plaintiff's "Eligible" status before the pretextual closure. Wirth is named as a defendant in *Riot v. Apex Trader Funding Inc.*, No. 1:24-cv-01557 (W.D. Tex.).

**John Mark Skelton** is a Co-Founder of Apex Trader Funding, Inc. and, upon information and belief, its former Chief Operating Officer. Skelton is the individual recorded on video describing Apex's strategy for identifying profitable traders and finding pretextual justifications to deny their payouts. In the recorded meeting, Skelton stated that he "tried to tear them apart and couldn't"—referring to his efforts to find any basis to deny payouts to traders who had done

nothing wrong—and asked meeting participants to stop recording, a request that supports an inference of consciousness of guilt. Skelton is named as a defendant in *Riot v. Apex Trader Funding Inc.*, No. 1:24-cv-01557 (W.D. Tex.).

**Anthony Todd Johnson** is the Chief of Staff (and, per court filings in *Riot v. Apex*, a principal) of Apex Trader Funding, Inc. Johnson is named as a defendant in *Riot v. Apex Trader Funding Inc.*, No. 1:24-cv-01557 (W.D. Tex.). Johnson is named individually for his direct participation in the direction and implementation of the practices described herein.

**Daniel Cook** is the Chief Marketing Officer and Chief Strategy Officer of Apex Trader Funding, Inc. Cook is responsible for the marketing campaigns that induce traders to pay subscription fees based on representations that profitable traders will receive payouts—representations that Apex's own internal practices are designed to frustrate.

**Chris Manning** is the Executive Vice President of Operations of Apex Trader Funding, Inc. Manning oversees the day-to-day operations of Apex's trading programs, including the account management, payout processing, and account-closure procedures at issue in this action.

**Cameron Nish** is the Director of Marketing of Apex Trader Funding, Inc. Nish participates in the creation and dissemination of the marketing materials that induce traders to participate in Apex's programs.

**Zachariah Ledesma** is the Risk Manager of Apex Trader Funding, Inc. Ledesma is responsible for the "Risk Department" that issued the pretextual closure of Plaintiff's account on April 10, 2026, and the decision to invoke a year-old technical-support ticket as grounds for seizing Plaintiff's earned trading profits.

**Vince Koehn** is the Business Development Manager of Apex Trader Funding, Inc. Koehn participates in the solicitation and recruitment of traders into Apex's programs.

**Calvin Johnson** is, upon information and belief, an officer or principal of Apex Trader Funding, Inc. who participated in the direction, authorization, or knowing permission of the conduct described herein.

**C. Individual Liability**

Each Individual Defendant is named in his individual capacity as an officer and principal of Apex who personally directed, authorized, participated in, or knowingly permitted the wrongful conduct described herein. Under Florida law, corporate officers who personally participate in tortious or fraudulent conduct are individually liable, regardless of whether they acted on behalf of the corporation. *White v. Mund*, 670 So. 2d 1038, 1039 (Fla. 4th DCA 1996). Under the CEA, "controlling persons" of entities that violate the Act are jointly and severally liable for such violations. 7 U.S.C. § 13c(b). Each Individual Defendant is a controlling person of Apex within the meaning of the statute.

## IV. THE AGREEMENT AND ITS KEY PROVISIONS

In or about October 2023, when Plaintiff first opened his personal account (APEX-89613), Plaintiff executed Apex's then-current Paid Funded Account Agreement, Document Ref: 2HQBF-OBOMT-HQFZ5-89CQ7. In February 2026, when Plaintiff opened the Pickleball Fanatics, LLC account, Plaintiff executed Apex's then-current Paid Funded Account Agreement (collectively, the "Agreement"). Upon information and belief, the provisions quoted herein are materially identical across both versions, with Apex retaining the unilateral right to revise the Agreement at any time without notice. The Agreement is a contract of adhesion drafted entirely by Apex and presented to traders on a take-it-or-leave-it basis after they have already invested substantial time and money in Apex's evaluation programs. Its provisions reveal a contractual framework that systematically eliminates all meaningful obligations on Apex's part while imposing comprehensive restrictions on the Trader.

### A. Unilateral Discretion Provisions

The Agreement is saturated with provisions granting Apex unilateral, unreviewable discretion over virtually every material aspect of the trading relationship:

> *"The Company may revise policies and terms under this Agreement and on the website at any time without notice."*
>
> *"Company may choose to close the account under any provision in this Agreement."*

> *"Company reserves the right to payout the trader at any time and under any circumstances earlier than the above mentioned timeframes at its sole discretion."*

**B. Ownership Disclaimers and Forfeiture**

> *"The account shall be owned by company with all funds held or deposited in the trading account used by the Trader during or after the Term of this Agreement. All rights to the funds whether in a live or simulation account shall belong to Company."*

This provision purports to disclaim all trader ownership of funds in the account, even when those funds represent earned trading profits that the Agreement itself promises to distribute.

**C. Confidentiality Clause**

> *"Trader shall keep this Agreement in whole or in part completely confidential or Trader shall forfeit their performance account and all payouts and be liable to company for damages sought by company."*

This provision operates as a gag clause designed to prevent traders from publicly reporting Apex's practices, sharing experiences with other traders, cooperating with regulatory investigations, or seeking collective redress.

**D. The Consistency and Payout Rules**

The Agreement establishes detailed trading-consistency requirements, including that no more than 30% of an account's balance may come from a single trading day, that traders must have a minimum of 10 individual trading days before requesting payout, and that traders must maintain a defined strategy or system. These requirements are facially reasonable but, in practice, serve as an arsenal of subjective criteria that Apex invokes selectively to deny payouts to profitable traders.

**E. The "Code of Conduct" Catch-All**

The Agreement incorporates by reference a "Code of Conduct" from Apex's FAQ section. This Code of Conduct is not attached to the Agreement, is not defined with specificity, and—like the Trading Rules—may be revised at any time without notice. It functions as an open-ended catch-

all that permits Apex to close any account and seize any balance for any reason, at any time, with no recourse for the trader.

## V. STATEMENT OF FACTS

### A. Apex's Business Model

Apex operates a multi-tiered trading program marketed as providing traders the opportunity to earn funded trading accounts and receive payouts from trading profits. The model operates as follows:

1. Traders pay monthly subscription fees to participate in a "Combine"—an evaluation account requiring profitable trading over a minimum number of days to pass.
2. Upon passing the Combine, traders pay an additional fee for a "Performance Account" ("PA")—a simulated funded account through which traders trade synthetic SIM currency and can request payouts subject to Apex's published criteria.
3. The Agreement provides that Apex "may set up a copy trade account to copy trader's trades from SIM account at any ratio with or without notice in a Live Account held by the Company." This copy-trade structure—where multiple traders' accounts feed into a master trading account controlled by Apex—is, by definition, a commodity pool.

In addition to subscription fees and PA account fees ($85 per month or a one-time fee), Apex charges exchange data fees and retains a 10% profit share on all payouts after the first $25,000. These multiple revenue streams—extracted from thousands of traders simultaneously—generate substantial income for Apex regardless of whether any individual trader receives a payout.

### B. Plaintiff's Three-Year Relationship with Apex

Plaintiff has maintained a paying relationship with Apex Trader Funding for over three years, during which time he has paid in excess of $50,000 in subscription fees, evaluation fees, activation fees, and platform costs through multiple accounts. Throughout this period, Plaintiff consistently demonstrated profitable trading in Apex's evaluation and simulated funded-account environments.

### C. The Original Account (APEX-89613) and the July 2025 2FA Lockout

Plaintiff's original account with Apex was account APEX-89613, opened under Plaintiff's personal name and the email address vpmconsultants22@gmail.com. In or around July 2025, Apex implemented a mandatory two-factor authentication ("2FA") system. Apex's own implementation was defective. After setting up 2FA through Google Authenticator as directed by Apex, Plaintiff was locked out of his account for multiple days because the system demanded a one-time password that could not be generated through the process Apex prescribed. This was Apex's technical failure, not Plaintiff's.

After days of being unable to access his own account—and losing trading opportunities as a result—Plaintiff expressed understandable frustration in support messages (Ticket #987433). Apex's response was to refund the evaluation fee and close account APEX-89613 as a technical-support resolution. Critically, no disciplinary "warning" was issued; no Code of Conduct provision was cited; no trading violation was identified. The matter was closed as a technical-support issue caused by Apex's own defective 2FA rollout.

On July 11, 2025, Apex's representative "Lizeth" explicitly invited Plaintiff to return, stating: "If you ever decide to return in the future, please submit a new ticket requesting the reactivation of your original account." Lizeth also noted that "creating multiple accounts is against Apex Trader Funding's policies." On July 15, 2025, Lizeth reiterated that Apex's policies "do not permit multiple accounts, and creating a new login would be against these guidelines." As set forth below, Plaintiff did not unilaterally create a hidden duplicate account; in February 2026 he opened a separate, distinct LLC account that Apex itself accepted, KYC-cleared, billed, and corresponded on for two months—thereby waiving any objection.

### D. The Pickleball Fanatics, LLC Account (February 2026) and Apex's KYC Obligation

In February 2026, Plaintiff opened a new account with Apex in the name of Pickleball Fanatics, LLC, a Florida limited liability company of which Plaintiff is the sole principal, using a separate business email address (support@dinkandlobfl.com). The account was not concealed; it was opened openly through Apex's standard onboarding process. Apex accepted the account through its own Know Your Customer ("KYC") verification process for a business entity—a

higher bar of due diligence than individual account verification, requiring entity-level identification, beneficial-ownership disclosure, and documentation that Apex itself prescribes.

The KYC obligation is Apex's. It runs at the time of account opening, not retroactively at the moment of payout. If Apex believed that Plaintiff's opening of the Pickleball Fanatics, LLC account in any way conflicted with Apex's policies, the time to reject the account was at signup, before collecting a single dollar in subscription fees. Apex did the opposite: it accepted the entity, processed the KYC, billed and collected approximately $10,000 in subscription fees over the following two months, permitted Plaintiff to satisfy multiple combine evaluations, and allowed him to open and trade a Performance Account funded with a $150,000 starting balance.

Throughout the entire relationship, Apex's own support correspondence addressed Plaintiff by his personal name, "Vincent," rather than by the LLC's business name. Apex therefore knew exactly who was behind the account and chose to accept the relationship, collect subscription fees, and permit trading without objection. Apex's internal records corroborate this: the Risk Department's closure message, dated April 10, 2026, expressly cross-references the prior personal-account ticket #987433—establishing that Apex's systems had linked the two accounts from the outset, and that Apex's acceptance of the LLC account was not a matter of mistake or surprise.

Under both Florida and Texas law, a party that accepts performance with knowledge of an alleged breach, and continues to bill and collect fees on that performance, waives the alleged breach and is estopped from later asserting it. Apex's two months of fee collection and named correspondence with Plaintiff constitute waiver and equitable estoppel as a matter of law. The retroactive invocation of Lizeth's July 2025 multiple-account language—after Apex itself approved the new entity at KYC and accepted months of fees—cannot defeat that waiver.

**E. The Pretextual Closure (April 10, 2026)**

Plaintiff traded consistently and profitably over six trading days on the Performance Account. As of Trade Day 6, Apex's own trading-progression system confirmed the following:

- Most Recent Payout Request: None
- Last Violation: None
- Last Ignored Session: None

- End-of-Day Balance: $168,495.28
- Profit: $18,495.28
- Highest Trading Day Profit: $6,707.16
- Minimum Balance Met: Yes
- 5 Days $300+ Met: Yes
- Minimum Trading Days Met: Yes
- Consistency Rule Met: Yes (36.26% of 50% threshold)
- Status: ELIGIBLE

Plaintiff has preserved a dated screenshot of this status page from Apex's own customer interface, taken on April 10, 2026. Every metric was satisfied. The system displayed a green "Eligible" status. There were no violations, no ignored sessions, and no prior payout requests. The account was clean, profitable, and fully payout-eligible by Apex's own published criteria.

At approximately 8:50 AM EDT on April 10, 2026, Plaintiff submitted a support ticket asking why he could not request a payout despite being marked as eligible. At 11:14 AM EDT—the same minute—Plaintiff received two separate communications:

*First*, from "Hector P" of Apex's support team: "After a thorough investigation, your account has been flagged for prohibited activity. This is against our policies." No specific prohibited activity was identified.

*Second*, from Apex's Risk Department: "Your account has been permanently closed due to being previously warned within ticket #987433 that your account has been permanently closed as well as violating our Code of Conduct through your messages." The Risk Department further stated that the decision was "final" and that Apex was "unable to provide further details or reconsideration," and threatened legal action if Plaintiff created any additional accounts.

Both messages were sent at the exact same time (11:14 AM EDT), suggesting a coordinated, pre-decided action rather than any genuine "thorough investigation" conducted in response to Plaintiff's 8:50 AM inquiry. The two messages cited materially different justifications—"prohibited activity" from Hector, and "Code of Conduct violation" plus the prior ticket from Risk—further evidencing the pretextual nature of the closure.

**F. Ticket #987433 Does Not Support the Stated Justification**

Plaintiff has retained the complete transcript of Ticket #987433. Its contents definitively establish that the ticket was a technical-support interaction arising from Apex's own defective 2FA rollout in July 2025. Plaintiff was locked out of his account for days, expressed frustration, and Apex resolved the matter by refunding the evaluation fee and closing the account. No disciplinary warning was issued. No Code of Conduct provision was cited. No trading violation was identified. The ticket was closed as a routine technical-support resolution.

Apex now retroactively characterizes this closed technical-support ticket as a "warning" and a "Code of Conduct violation" to justify seizing $18,495.28 in earned profits. This is revisionist, pretextual, and fraudulent.

Notably, Apex's internal notes on Ticket #987433 include an entry from Pablo Andrés Casas directing that the ticket be sent "back to Fraud when done." This confirms that Apex's fraud department was involved in the July 2025 ticket resolution, strengthening the inference that Apex's internal systems would have flagged the Pickleball Fanatics, LLC account as connected to Plaintiff's prior account from the outset—making Apex's claim of surprise at the point of payout even less credible.

**G. The Skelton Video — Direct Evidence of the Scheme**

Plaintiff's experience is not an isolated incident. It is a manifestation of a systematic scheme to defraud traders that has been described by Apex's own co-founder, John Mark Skelton, in recorded video footage that is now part of the public record.

In that recording, which has been the subject of repeated suppression efforts across Reddit and mirror sites by Apex, Mr. Skelton describes the strategy for identifying profitable traders and finding pretextual justifications to deny their payouts. According to publicly available court documents from *Riot v. Apex Trader Funding Inc.*, No. 1:24-cv-01557 (W.D. Tex.), Mr. Skelton stated that he "tried to tear them apart and couldn't"—referring to his efforts to find any justification to deny payouts to traders who had done nothing wrong. He also asked participants in the recorded meeting to stop recording—a request that, in context, constitutes consciousness of guilt regarding the conduct being discussed.

Apex's own 2026 marketing campaign—advertising "no more payout denials"—is an implicit admission that payout denials were a defining feature of its prior business model. The fact that not denying payouts is now Apex's marketing strategy speaks volumes about the nature of the enterprise.

**H. Demand Letter, Litigation Hold, and Regulatory Complaints**

On April 10, 2026, within hours of the pretextual closure, Plaintiff served a Litigation Hold and Evidence Preservation Notice on Apex, addressed to Support, Legal, CEO Darrell Martin, CTO Bryan Wirth, and additional officers and personnel. The notice directed Apex to immediately preserve all potentially relevant evidence and to suspend any automatic deletion policies, including with respect to communications, account records, internal notes, ticket transcripts, and copy-trade and master-account data.

On April 11, 2026, Plaintiff served a Formal Demand for Payment, Notice of Intent to Commence Federal Litigation, and Notice of Regulatory Complaints, demanding payment of all sums owed and establishing a ten-business-day deadline for compliance.

On April 10, 2026, Plaintiff filed a CFTC Whistleblower Complaint (Form TCR, Confirmation No. 2604-1016-4101-52) identifying Apex's principals, documenting the scheme described herein, and referencing the Skelton video, the NFA BASIC search results, and the pattern of pretextual closures. A TCR Supplement was subsequently filed to complete certain fields and provide clarifications.

None of the recipients of the Litigation Hold has substantively responded or acknowledged receipt. Apex's retained counsel, Robert Morris of Morris Law Group (New Rochelle, NY), subsequently contacted Plaintiff but has not substantively addressed the claims or the demand.

**I. Spoliation: Apex's Post-Hold Lockout and "Fraudulent Activity Detected" Notice**

On April 14, 2026—four days after Plaintiff served the Litigation Hold and Evidence Preservation Notice on Apex and its principals—Plaintiff attempted to log in to his Apex account dashboard for the purpose of preserving and documenting additional records relevant to this dispute, including trade history, ticket transcripts, fee records, and copy-trade data. Apex denied

that access. In place of the dashboard, Apex displayed a red banner reading "Fraudulent Activity Detected." Plaintiff has preserved a dated screenshot of that display.

Apex's post-hold conduct is independently actionable on multiple grounds. *First*, branding Plaintiff as a fraudster on Apex's own platform—after Apex was on formal notice of pending litigation, after Plaintiff had filed a CFTC Whistleblower Complaint, and without any specific factual predicate ever provided by Apex—is a deceptive and bad-faith act that supports Plaintiff's FDUTPA, fraud, and punitive-damages claims. *Second*, denying Plaintiff access to records within Apex's exclusive control, immediately after Apex was directed to preserve those records, constitutes spoliation of evidence and a violation of Apex's preservation obligations under Federal Rule of Civil Procedure 37(e). The lockout deprived Plaintiff of the ability to access, capture, and preserve evidence that bears directly on the issues in this case—evidence that Apex itself is now the sole custodian of.

Plaintiff respectfully reserves the right to seek, and will seek, an adverse-inference instruction, evidentiary preclusion, and other appropriate sanctions under Federal Rule of Civil Procedure 37(e) and the Court's inherent authority. *See Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005) (sanctions warranted where party with notice of litigation fails to preserve evidence in its exclusive custody).

### J. Widespread Pattern of Abuse

Plaintiff's experience is not isolated. Tens of thousands of documented complaints from traders are available across social-media platforms including Reddit, Trustpilot, Discord, and Facebook, describing substantially similar patterns: arbitrary rule changes, withheld payouts, technical failures blamed on traders, and inadequate dispute resolution. In May 2025 alone, Apex banned an enormous number of profitable traders in a mass purge that has been widely documented on social media. This widespread pattern is consistent with a business model that functions as a subscription-based scheme designed to continuously extract fees while systematically denying payouts.

## VI. ARGUMENT

### A. Count I: Operation of an Unregistered Commodity Pool (7 U.S.C. §§ 6m, 6o)

The Commodity Exchange Act requires any person operating a commodity pool to register as a Commodity Pool Operator with the CFTC and become a member of the NFA. 7 U.S.C. § 6m(1). A "commodity pool" is "any investment trust, syndicate or similar form of enterprise operated for the purpose of trading commodity interests." CFTC Rule 4.10(d)(1). A "commodity pool operator" is any person who "solicits, accepts, or receives from others, funds, securities, or property … for the purpose of trading in commodity interests." 7 U.S.C. § 1a(11).

Apex's own Agreement and business structure establish that it operates a commodity pool: (1) the Agreement provides that Apex "may set up a copy trade account to copy trader's trades from SIM account at any ratio with or without notice in a Live Account held by the Company," such that multiple traders' accounts feed into a master trading account controlled by Apex; (2) Apex solicits and receives funds from traders in the form of subscription fees, commissions, exchange fees, data fees, and a 10% share of trading profits; (3) these funds flow into a pooled structure through which futures contracts are traded on regulated exchanges (CME, CBOT, COMEX, NYMEX); and (4) traders' compensation is calculated as a proportionate allocation of "Trading Profits"—the hallmark of a pooled investment structure.

Apex is not registered with the CFTC or NFA as a Commodity Pool Operator. A search of the NFA's Background Affiliation Status Information Center ("BASIC") database returned no current or historical registration for Apex Trader Funding, Inc., Apex Investing Institute, Darrell Roland Martin, John Mark Skelton, Bryan Wirth, or Anthony Todd Johnson in any CFTC- or NFA-regulated capacity. Apex will argue that it is engaged in "proprietary trading" for its own account and risk. But this characterization is a legal fiction. Apex does not fund its trading from its own capital alone; it solicits funds from thousands of traders through subscription fees and profit-sharing, combines those funds, and allocates profits and losses to individual trader sub-accounts. This is precisely the activity the CPO registration requirement was designed to regulate. *See CFTC v. Equity Fin. Grp., LLC*, No. 04-cv-1512 (C.D. Cal. 2005).

The failure to register as a CPO is not a mere technical violation. CPO registration imposes critical protections for pool participants, including mandatory disclosure documents, periodic reporting to the NFA, segregation of pool-participant funds, restrictions on commingling, and fiduciary obligations to pool participants. Apex's failure to register enables it to operate without

these protections—withholding account statements, modifying rules unilaterally, and seizing trader capital—precisely the abuses that CPO registration is designed to prevent.

**B. Count II: Fraud and Manipulation Under the CEA (7 U.S.C. § 9(1); 17 C.F.R. § 180.1)**

The CEA's anti-fraud provisions prohibit any person from employing any manipulative or deceptive device or contrivance in connection with any swap, contract of sale of any commodity in interstate commerce, or contract for future delivery. 7 U.S.C. § 9(1); 17 C.F.R. § 180.1.

Apex's conduct constitutes fraud and manipulation in multiple respects. *First*, Apex markets funded trading accounts while systematically altering rules to prevent payouts—a classic scheme to defraud. *Second*, Apex's Agreement authorizes it to "revise policies and terms ... at any time without notice," enabling it to change the rules after traders have invested time and money. *Third*, Apex's own co-founder, John Mark Skelton, described on video the company's strategy for finding pretextual justifications to deny payouts to profitable traders—direct evidence of fraudulent intent. *Fourth*, Apex's deliberate withholding of comprehensive account statements prevents traders from detecting and documenting the fraud. *Fifth*, Apex's confidentiality clause operates to suppress reporting of the scheme. *Sixth*, Apex's post-hold display of "Fraudulent Activity Detected" against an account it itself had KYC-cleared and billed for two months is a deceptive act undertaken to manufacture a false justification for the closure and to chill regulatory and litigation reporting.

**C. Count III: Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing**

A breach of contract claim requires: (1) a valid contract; (2) a material breach; and (3) resulting damages. *Friedman v. New York Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. 4th DCA 2008).

***1. Apex Breached the Agreement.***

Apex's own system confirmed that Plaintiff satisfied every published payout-eligibility criterion. The Agreement provides that traders who meet these criteria are "entitled to 100% of the first $25,000 they withdrawal." Apex's closure of the account at the moment of payout submission, on pretextual grounds having nothing to do with trading performance, constitutes a willful breach of the contractual promise that traders who satisfy the published criteria will receive payouts.

***2. Breach of the Implied Covenant.***

The implied covenant of good faith and fair dealing inheres in every contract. *Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001). Even where a contract grants discretion, that discretion must be exercised in good faith and may not be used to destroy the other party's right to receive contractual benefits. Apex's pattern of (a) accepting an LLC account through KYC, (b) collecting two months of subscription fees, (c) corresponding with Plaintiff by name throughout, and (d) then invoking a year-old technical-support ticket to seize earned profits at the precise moment of payout is the paradigmatic violation. Apex's post-litigation-hold lockout and "Fraudulent Activity Detected" banner compound the breach.

**D. Count IV: Fraudulent Inducement**

Fraudulent inducement requires: (1) a false statement of material fact; (2) knowledge of falsity; (3) intent to induce reliance; and (4) resulting injury. *Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985).

Apex's marketing represents that by paying subscription fees, passing the Combine, and trading profitably, traders will receive payouts and advance to funded live accounts. These representations are materially misleading because Apex knows—and the Agreement itself confirms—that it retains absolute discretion to deny any payout, close any account at any time for any reason, change any rule without notice, and terminate trading for no reason. The marketed promise of funded trading with payouts is illusory by Apex's own contractual design. Each Individual Defendant personally participated in the creation, approval, and dissemination of these misleading marketing representations.

**E. Count V: Violation of the Florida Deceptive and Unfair Trade Practices Act**

FDUTPA, Fla. Stat. § 501.204, prohibits unfair or deceptive acts in the conduct of any trade or commerce. Apex's pattern of marketing favorable conditions, collecting fees, KYC-clearing accounts, and then systematically invoking pretextual grounds to seize earned profits is the quintessential deceptive trade practice. The concealment of material forfeiture terms, the pretextual closure of payout-eligible accounts, the retroactive invocation of year-old technical-support tickets to seize earned profits, and the post-litigation-hold display of a "Fraudulent Activity

Detected" banner against an account Apex itself had cleared and billed for two months compound the deception. Under FDUTPA, Plaintiff is entitled to actual damages, attorney's fees, and injunctive relief. Fla. Stat. § 501.211.

**F. Count VI: Conversion**

Conversion is an act of dominion wrongfully asserted over another's property. *Seymour v. Adams*, 638 So. 2d 1044, 1047 (Fla. 5th DCA 1994). The Agreement provides that traders shall receive a proportionate allocation of trading profits. Once profits are earned and allocated—as confirmed by Apex's own "Eligible" status—they become Plaintiff's property. Apex's seizure of $18,495.28 in earned trading profits, on pretextual grounds unrelated to any trading-performance issue, constitutes wrongful dominion over Plaintiff's property. The ownership disclaimers in the Agreement cannot insulate Defendants from conversion claims to the extent those disclaimers are themselves unconscionable or the product of fraud.

**G. Count VII: Unjust Enrichment**

Unjust enrichment requires: (1) a benefit conferred; (2) knowledge of the benefit; (3) acceptance or retention; and (4) inequitable circumstances. *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012). Plaintiff conferred substantial benefits on Defendants over more than three years: in excess of $50,000 in subscription, evaluation, activation, and platform fees on his original account; approximately $10,000 in subscription fees on the Pickleball Fanatics, LLC account; commissions, exchange fees, NFA fees, and data fees throughout; and $18,495.28 in earned trading profits. Defendants accepted and retained all benefits. Defendants' systematic denial of payouts while retaining all fees and profits renders their enrichment unjust. This claim is pleaded in the alternative.

**H. Count VIII: Breach of Fiduciary Duty and Conflict of Interest**

To the extent Apex acts as an intermediary in facilitating Plaintiff's trading activity—and particularly if Apex is determined to be operating as a CPO—it owes Plaintiff fiduciary duties of loyalty and fair dealing. The Agreement reveals a structural conflict of interest: Apex profits from (a) subscription fees from traders who are repeatedly liquidated and must resubscribe; (b) a share of payouts; (c) commissions and fees on every trade; and (d) the copy-trade structure through

which Apex replicates profitable traders' positions in its own live account. Revenue streams (a), (c), and (d) create a perverse incentive to facilitate trader failure rather than success. This structural conflict is fundamentally incompatible with fiduciary obligations.

**I. Count IX: Unconscionability**

Florida law requires both procedural and substantive unconscionability to invalidate a contract or contractual provision, but evaluates them on a sliding scale: "the procedural and substantive prongs need not be present to the same degree, and … the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to conclude that the term is unenforceable, and vice versa." *Basulto v. Hialeah Automotive*, 141 So. 3d 1145, 1159 (Fla. 2014); *see also SHEDDF2-FL3, LLC v. Penthouse S., LLC*, 314 So. 3d 403, 408 (Fla. 3d DCA 2020). The Florida Supreme Court has expressly recognized that "consumer adhesion contracts, where there is virtually no bargaining between the parties, the commercial enterprise or business responsible for drafting the contract is in a position to unilaterally create one-sided terms that are oppressive to the consumer, the party lacking bargaining power." *Basulto*, 141 So. 3d at 1157.

**Procedural Unconscionability.** Procedural unconscionability examines the manner in which the contract was made and "whether the complaining party had a meaningful choice at the time the contract was signed." *Florida Holdings III, LLC v. Duerst ex rel. Duerst*, 198 So. 3d 834, 838 (Fla. 2d DCA 2016). The Agreement is a classic contract of adhesion drafted entirely by Apex and presented on a take-it-or-leave-it basis to traders who have already invested substantial time and money in Apex's evaluation programs. The Agreement was executed under economic duress: after completing Apex's evaluation process and earning profits through trading, Plaintiff was required to sign as a non-negotiable condition of accessing capital he had already earned, with no meaningful alternative and no opportunity to negotiate.

**Substantive Unconscionability.** A contract term is substantively unconscionable when it is "so outrageously unfair as to shock the judicial conscience"—one that "no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." *Woebse v. Health Care & Ret. Corp. of Am.*, 977 So. 2d 630, 632 (Fla. 2d DCA 2008); *Belcher v. Kier*, 558 So. 2d 1039, 1044 (Fla. 2d DCA 1990). Multiple provisions of the

Agreement satisfy that standard independently and cumulatively: (1) unlimited unilateral discretion to close accounts and seize all funds; (2) the right to revise all policies and terms at any time without notice; (3) the confidentiality clause functioning as a gag order against trader complaints, regulatory cooperation, and collective redress; (4) the limitation-of-liability clause capping Apex's exposure at the amount paid by Trader, even where Apex has seized far larger sums in earned profits; (5) the "no refunds" policy; and (6) the forfeiture provisions permitting seizure of all funds for any breach, real or manufactured. Under the *Basulto* sliding-scale framework, the extreme one-sidedness of these substantive terms requires only modest evidence of procedural unconscionability—a threshold that the take-it-or-leave-it adhesion-contract circumstances of formation easily satisfy.

**J. Count X: Controlling-Person Liability Under 7 U.S.C. § 13c(b)**

Section 13c(b) of the CEA provides that any person who, directly or indirectly, controls any person who has violated any provision of the CEA or rules thereunder "may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person." 7 U.S.C. § 13c(b). The provision is read broadly to include controlling persons in private actions for the underlying violations. *Cf. CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002).

Each Individual Defendant—Darrell Roland Martin (CEO and Founder), Bryan Wirth (CTO), John Mark Skelton (Co-Founder), Anthony Todd Johnson (Chief of Staff), Daniel Cook (CMO/CSO), Chris Manning (EVP Operations), Cameron Nish (Director of Marketing), Zachariah Ledesma (Risk Manager), Vince Koehn (Business Development Manager), and Calvin Johnson—is, upon information and belief, a controlling person of Apex within the meaning of § 13c(b). Each personally directed, authorized, participated in, or knowingly permitted the conduct underlying Counts I and II, including the unregistered operation of a commodity pool, the marketing of trading programs that the Agreement's own terms render illusory, the design and implementation of the pretextual closure mechanism, the suppression of trader complaints through the confidentiality clause, and (with respect to those involved in the April 10–14, 2026 events) the post-litigation-hold lockout.

Each Individual Defendant is therefore jointly and severally liable with Apex for the violations of the CEA pleaded in Counts I and II, in addition to any independent liability arising

under Florida law for personal participation in tortious conduct. *See White v. Mund*, 670 So. 2d 1038, 1039 (Fla. 4th DCA 1996).

## VII. CONCLUSION AND PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff respectfully submits that this Court has jurisdiction over this action under both diversity and federal question jurisdiction; that the Agreement's forum-selection, arbitration, and jury-waiver clauses are unconscionable and unenforceable; and that the facts and law establish meritorious claims against all Defendants for operation of an unregistered commodity pool, fraud and manipulation under the CEA, breach of contract, fraudulent inducement, violations of the Florida Deceptive and Unfair Trade Practices Act, conversion, unjust enrichment, breach of fiduciary duty, unconscionability, and controlling-person liability.

Plaintiff respectfully requests the following relief:

1. A declaration that Apex Trader Funding, Inc. operates an unregistered commodity pool in violation of 7 U.S.C. § 6m and that each Individual Defendant is a controlling person jointly and severally liable under 7 U.S.C. § 13c(b);

2. A declaration that the Agreement's arbitration clause, forum-selection clause, jury-waiver provision, confidentiality clause, and limitation-of-liability clause are unconscionable and unenforceable;

3. Compensatory damages including all subscription, evaluation, activation, and platform fees paid in excess of $50,000 over more than three years on the original account; approximately $10,000 in subscription fees paid on the Pickleball Fanatics, LLC account; the $18,495.28 in seized trading profits; lost trading profits; and consequential damages;

4. Punitive damages for Defendants' willful, wanton, and fraudulent conduct, including the post-litigation-hold display of a "Fraudulent Activity Detected" banner against Plaintiff's account;

5. Statutory damages, attorney's fees, and costs under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.211;

6. Injunctive relief ordering Defendants to: (a) immediately release Plaintiff's earned trading profits; (b) register as a Commodity Pool Operator or cease operations; (c) cease the practice of pretextual account closures to deny earned payouts; (d) provide full and transparent account statements to all traders; and (e) rescind the confidentiality clause as applied to truthful statements;

7. Disgorgement of all ill-gotten gains derived from Defendants' operation of the unregistered commodity pool;

8. An adverse-inference instruction at trial, evidentiary preclusion, and other appropriate sanctions under Federal Rule of Civil Procedure 37(e) and the Court's inherent authority arising from Apex's post–litigation-hold denial of access and "Fraudulent Activity Detected" display on April 14, 2026;

9. Pre-judgment and post-judgment interest as allowed by law;

10. Trial by jury on all issues so triable; and

11. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Vincent McCrudden
**VINCENT McCRUDDEN**
*Plaintiff, Pro Se*
31 Flyer Circle
Saint Johns, FL 32259

(646) 220-9900
vmccrudden@gmail.com