**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

VINCENT McCRUDDEN,
Plaintiff,

v. Case No. 3:26-cv-1073-WWB-LLL

APEX TRADER FUNDING, INC., a Texas corporation; DARRELL ROLAND MARTIN; BRYAN WIRTH; JOHN MARK SKELTON; ANTHONY TODD JOHNSON; DANIEL COOK; CRIS MANNING; CAMERON NISH; and VINCE KOEHN,

Defendants.

---

# SECOND AMENDED COMPLAINT

## JURY TRIAL DEMANDED

Plaintiff Vincent McCrudden, appearing pro se, hereby files this Second Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(2). Plaintiff respectfully alleges as follows:

## I. NATURE OF THE ACTION

1. This is a civil action arising under the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1–26, and CFTC regulations promulgated thereunder, 17 C.F.R. pts. 1–190, and under Florida statutory and common law, seeking damages and equitable relief against Defendant Apex Trader Funding, Inc. ("Apex") and the individual Defendants for the operation of an unregistered commodity pool; for fraud and manipulation in connection with commodity-interest transactions; and for breach of contract, fraudulent inducement,

violations of the Florida Deceptive and Unfair Trade Practices Act, conversion, unjust enrichment, breach of fiduciary duty, unconscionability, and controlling-person liability.

2. Apex represents itself to the public as a "proprietary trading" firm that offers traders access to "funded" trading accounts in exchange for subscription fees. In reality, as alleged herein, Apex operates a commodity pool: it solicits, accepts, and pools millions of dollars in fees and contributions from tens of thousands of traders; its purported "proprietary" funding is sourced from those pooled fees; trades are aggregated through a master-trading-account structure expressly contemplated by Apex's own form agreement; and traders are compensated as a proportionate allocation of "Trading Profits." That structure is the hallmark of a pooled investment vehicle, and operation of such a vehicle without CFTC registration as a Commodity Pool Operator ("CPO") violates 7 U.S.C. § 6m(1).

3. Apex's marketing model is built on representations that are at best materially misleading and at worst affirmatively false. Apex publicly advertises "NO Payout Denials," "Simple Rules. No Gray Area. No 'Interpretation' of rules," "No Gimmicks. No Hidden Rules," and "5 Trading Days. No denied payouts." These representations were made to Plaintiff and to thousands of other traders to induce the payment of subscription fees. They were untrue when made and remain untrue today. Plaintiff's experience—documented herein—is the rule, not the exception.

4. Plaintiff is a twenty-five-year Wall Street veteran who previously held FINRA Series 3, 4, 7, 24, 55, and 63 securities licenses. He has been an Apex trader since 2023, paying more than fifty thousand dollars in subscription fees on his original individual account (APEX-89613) before opening a second account in February 2026 in the name of his limited-liability company Pickleball Fanatics, LLC—an account that Apex itself KYC-cleared, billed, supported, and addressed to Plaintiff by name. On April 9, 2026, Plaintiff's account satisfied every payout-eligibility criterion that Apex itself published, with a balance of $168,495.28 and "Eligible" status reflected on Apex's own platform. Within hours of his payout submission, Apex closed the account and seized $18,495.28 in earned profits, citing as pretext a 2025 customer-service ticket (#987433) that was, in fact, a two-factor-authentication technical-support issue caused by Apex's own system.

5. Apex's payout-denial scheme has been publicly described by Apex's own Co-Founder and Chief Operating Officer, John Mark Skelton, in a recorded Zoom video conference whose existence and content are matters of public record in litigation pending in the United States District Court for the Western District of Texas. See Riot v. Apex Trader Funding Inc., No. 1:24-cv-01557-ADA (W.D. Tex.). In that recording, Skelton described measures and rule changes that Apex was going to and ultimately instituted in order, in his own characterization, to "attack" Apex's large number of payouts to users and to cause psychological distress to Apex traders. Id., Dkt. 70, at 3 (Feb. 14, 2025) (motion to quash and supporting affidavits). Apex's response, in that action, has been to obtain an Agreed Temporary Restraining Order to suppress further disclosure of the recording, id., Dkt. 31, and to seek contempt sanctions against the persons who lawfully published it, id., Dkt. 33.

6. Four days after Plaintiff served Apex with a litigation hold and evidence-preservation notice, Apex displayed a red "Fraudulent Activity Detected" banner against Plaintiff's account dashboard—an account that Apex itself had onboarded, KYC-cleared, billed, and serviced for nearly two months—and locked Plaintiff out of his ability to access his own trade history, ticket transcripts, fee records, and copy-trade data. Plaintiff reserves the right to seek spoliation sanctions under Federal Rule of Civil Procedure 37(e) and the Court's inherent authority for that conduct.

7. Plaintiff seeks compensatory, statutory, and punitive damages; declaratory relief that Apex is an unregistered commodity pool operator and that the form agreement's arbitration, forum-selection, jury-waiver, confidentiality, and limitation-of-liability clauses are unconscionable; disgorgement; injunctive relief; attorneys' fees and costs as available; and such other relief as the Court deems just and proper.

## II. JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, because this action arises under the laws of the United States, namely the Commodity Exchange Act, 7 U.S.C. §§ 1–26, and CFTC regulations promulgated thereunder.

9. The Court has supplemental jurisdiction over the related state-law claims pursuant to 28 U.S.C. § 1367, as those claims form part of the same case or controversy.

10. The Court also has subject-matter jurisdiction under 28 U.S.C. § 1332. Plaintiff is a citizen of Florida. Defendant Apex Trader Funding, Inc. is a Texas corporation with its principal place of business outside Florida. Upon information and belief, none of the individual Defendants is a citizen of Florida. The amount in controversy, exclusive of interest and costs, exceeds $75,000.

11. This action is expressly authorized by Section 22 of the CEA, 7 U.S.C. § 25(a)(1), which creates a private right of action for actual damages on behalf of any person who, *inter alia*, "deposited with or paid to such person money, securities, or property . . . in connection with any order to make such contract or any swap." 7 U.S.C. § 25(a)(1)(B). The Supreme Court has confirmed that the CEA creates a private right of action for fraud in favor of a customer against persons within the statute's reach. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982). Plaintiff fits squarely within § 25(a)(1)(B) because he paid Apex substantial sums in connection with orders to make contracts of sale of commodities for future delivery.

12. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and 7 U.S.C. § 25(c). Plaintiff resides in St. Johns County, Florida. A substantial part of the events and omissions giving rise to the claims occurred in this District, including: (a) Plaintiff's payment of subscription, evaluation, activation, platform, data, and exchange fees to Apex; (b) Plaintiff's solicitation by Apex through interstate-commerce channels directed into this District; (c) Plaintiff's reliance on Apex's representations from this District; (d) Plaintiff's execution of trades from this District through the Apex platform; and (e) the financial injury to Plaintiff suffered in this District.

13. This case is properly before the Jacksonville Division pursuant to Local Rule 1.04(b) because the events giving rise to the action occurred in St. Johns County, Florida, which lies within the Jacksonville Division.

14. A related action arising from substantially similar conduct by a sister proprietary-trading firm and pleading substantially identical Commodity Exchange Act

counts is pending before the same District Judge and Magistrate Judge: McCrudden v. TopstepFunded LLC, et al., Case No. 3:26-cv-00816-WWB-LLL (M.D. Fla., Jacksonville Division). A Notice of Pendency of Related Cases under Local Rule 1.07(c) has been filed in both actions.

## III. PARTIES

### A. Plaintiff

15. Plaintiff Vincent McCrudden is an individual residing in St. Johns County, Florida. Plaintiff is a twenty-five-year Wall Street veteran who previously held FINRA Series 3, 4, 7, 24, 55, and 63 securities licenses. Plaintiff opened his original individual Apex Performance Account, designated APEX-89613 and associated with the email vpmconsultants22@gmail.com, in 2023. In February 2026, Plaintiff opened a separate Apex Performance Account in the name of his limited-liability company, Pickleball Fanatics, LLC, associated with the email support@dinkandlobfl.com (the "Pickleball Fanatics Account"). Plaintiff is the sole member and manager of Pickleball Fanatics, LLC. By written assignment effective May 31, 2026, Pickleball Fanatics, LLC assigned and transferred to Plaintiff, individually, all claims, demands, and causes of action arising out of or relating to the Pickleball Fanatics Account, including all claims asserted in this action. Plaintiff is therefore the owner of those claims and the real party in interest with respect to them under Federal Rule of Civil Procedure 17(a), and brings this action in his individual capacity both on his own claims and as assignee of the claims formerly held by Pickleball Fanatics, LLC.

### B. Defendants

16. Defendant Apex Trader Funding, Inc. ("Apex") is a Texas corporation. Apex uses as a mailing address what records reflect to be a UPS Store mailbox at 2028 E. Ben White Blvd., Ste. 240-9873, Austin, Texas 78741—a private commercial mail-receiving agency address, not a brick-and-mortar headquarters address. Apex has never been registered with the Commodity Futures Trading Commission ("CFTC") or the National Futures Association ("NFA") in any capacity.

17. Defendant Darrell Roland Martin is, upon information and belief, an individual believed to reside in Texas. Martin is the Chief Executive Officer and founder of Apex. Martin has never been registered with the CFTC or NFA in any capacity.

18. Defendant Bryan Wirth is, upon information and belief, an individual believed to reside in Texas. Wirth is identified by Apex as its Chief Technology Officer. Wirth has never been registered with the CFTC or NFA in any capacity.

19. Defendant John Mark Skelton is, upon information and belief, an individual believed to reside in Texas. Skelton is identified, in public-record filings in Riot v. Apex Trader Funding Inc., No. 1:24-cv-01557-ADA (W.D. Tex.), Dkt. 70, at 3, as Apex's Co-Founder and Chief Operating Officer. Skelton has never been registered with the CFTC or NFA in any capacity.

20. Defendant Anthony Todd Johnson is, upon information and belief, an individual believed to reside in Texas. Johnson is identified by Apex as its Chief of Staff. Johnson has never been registered with the CFTC or NFA in any capacity.

21. Defendant Daniel Cook is, upon information and belief, an individual believed to reside in Texas. Cook is identified by Apex as its Chief Marketing Officer / Chief Sales Officer. Cook has never been registered with the CFTC or NFA in any capacity.

22. Defendant Cris Manning is, upon information and belief, an individual believed to reside in Texas. Manning is identified by Apex as its Executive Vice President of Operations. Manning has never been registered with the CFTC or NFA in any capacity.

23. Defendant Cameron Nish is, upon information and belief, an individual believed to reside in Texas. Nish is identified by Apex as its Director of Marketing. Nish has never been registered with the CFTC or NFA in any capacity.

24. Defendant Vince Koehn is, upon information and belief, an individual believed to reside in Texas. Koehn is identified by Apex as its Business Development Manager. Koehn has never been registered with the CFTC or NFA in any capacity.

25. Each Individual Defendant is, upon information and belief, a person who, directly or indirectly, controls Apex within the meaning of Section 13(b) of the CEA, 7 U.S.C. § 13c(b), and is jointly and severally liable for Apex's CEA violations to the same extent as Apex itself.

## IV. FACTUAL ALLEGATIONS

### A. The Apex Business Model

26. Apex represents itself to the public as a "proprietary trading" firm. Apex markets multi-tier subscription products to retail traders, who pay recurring monthly fees, plus evaluation, activation, platform, data, and exchange fees, for the opportunity to participate in two-phase "Evaluation" and "Performance Account" programs. Apex markets these programs to traders as providing access to futures-contract trading on regulated exchanges, including the Chicago Mercantile Exchange ("CME"), the Chicago Board of Trade ("CBOT"), the Commodity Exchange ("COMEX"), and the New York Mercantile Exchange ("NYMEX"). The Evaluation phase is acknowledged by Apex's own Agreement to be a "SIM" (simulated) environment, and the actual venue of execution, internalization, or counterparty-routing of trader orders in either the Evaluation or Performance Account phase is not publicly disclosed by Apex. Whether and to what extent trader positions marketed as exchange-traded futures are in fact executed on those exchanges, internalized on Apex's books, or routed against a swap counterparty is a question central to Plaintiff's Commodity Exchange Act counts and one on which discovery will follow.

27. Apex's form Performance Account Agreement (the "Agreement"), which every trader is required to execute as a condition of participation, expressly authorizes Apex to "set up a copy trade account to copy trader's trades from SIM account at any ratio with or without notice in a Live Account held by the Company." That language means, in operation, that multiple traders' positions are aggregated, mirrored, copied, and netted through a single master trading account that Apex itself controls and from which Apex extracts the economic spread between trader-reported "profits" and the actual cleared-trade results.

28. Apex solicits, accepts, and receives substantial funds from traders in multiple forms, including: (a) monthly subscription fees; (b) evaluation fees; (c) activation fees; (d) platform fees; (e) data fees; (f) exchange fees; and (g) a percentage share of profits beyond a threshold. These funds flow into a pooled commercial structure. Trader compensation is calculated as a proportionate allocation of "Trading Profits" as defined in the Agreement—the hallmark of a pooled investment vehicle.

29. Apex publicly represents on its website that the "Total Compensation to Customers Since 2022" has been a specifically advertised metric. That representation is itself a public admission that Apex has been operating, soliciting trader funds, and paying out trader compensation as a commercial pool operator continuously since 2022, throughout which period Apex was not—and is not—registered with the CFTC as a Commodity Pool Operator.

**B. Apex's Public Marketing Representations**

30. Apex's public marketing—directed at retail traders and at Plaintiff specifically—consists of categorical representations about its business practices that were and remain untrue. The Apex homepage at apextraderfunding.com, screenshots of which Plaintiff has preserved and dated, prominently features representations including the following:

31. (a) Under a banner labeled "The Apex Difference," Apex represents: "NO Payout Denials."

32. (b) Under a banner labeled "Rules," Apex represents: "Simple Rules. No Gray Area. No 'Interpretation' of rules. Nothing Vague. Nothing Obscure. No arbitrary rules. No Gimmicks. No Hidden Rules."

33. (c) Under a banner labeled "Payouts," Apex represents: "5 Trading Days. No denied payouts."

34. (d) Apex represents that the "Consistency Rule" applicable to trader accounts permits up to 50% of single-day profits to be attributed toward a payout, with no day's profits exceeding 50% of the total profit balance—a published threshold that

Plaintiff's account on April 9, 2026 satisfied at 36.26%, well within the published 50% maximum.

35. (e) Apex represents that there are "NO Eval consistency rules," promising the absence of the very arbitrary obstacles to payout that Apex in fact deploys.

36. (f) Apex represents that traders who satisfy the published payout-eligibility criteria "are entitled to 100% of the first $25,000 they withdrawal."

37. These representations were and are material. They are the express inducement that brings retail traders, including Plaintiff, to pay subscription fees in the expectation of a fair, rule-based, non-discretionary process. They are also material to scienter, because each representation is one that Apex's officers know to be untrue at the moment it is made: as alleged below, the testimony of Apex's own Co-Founder and COO confirms that Apex has, by design, taken affirmative measures to attack its large number of payouts to users.

38. Apex's recent 2026 marketing campaign, in which it advertises "no more payout denials," is an implicit admission that payout denials were a defining feature of its prior business model. The fact that not denying payouts is now Apex's marketing strategy speaks volumes about the historical and continuing nature of the enterprise.

**C. Corporate Opacity**

39. Apex maintains affirmative corporate opacity that supports the inference of intentional regulatory evasion. Apex's public-facing address is a UPS Store mailbox at 2028 E. Ben White Blvd., Ste. 240-9873, Austin, Texas 78741—a private commercial mail-receiving agency, not a corporate headquarters. Apex publishes no officer registry beyond first-name customer-service representatives and a "Risk Department" that communicates from generic addresses. Apex appears in no NFA Background Affiliation Status Information Center ("BASIC") registration record in any capacity, despite operating, soliciting funds from, and paying compensation to tens of thousands of traders since at least 2022. This pattern of opacity is itself a substantive allegation supporting the CEA, fraud, and FDUTPA counts.

### D. Plaintiff's Trading History with Apex (2023–2026)

40. In 2023, Plaintiff opened an individual Apex Performance Account (APEX-89613) associated with the email address vpmconsultants22@gmail.com. Plaintiff paid more than fifty thousand dollars in subscription, evaluation, activation, platform, data, and exchange fees on the original account over a period exceeding three years.

41. Apex collected those fees, billed them on a recurring monthly basis, processed Plaintiff's payments, sent confirmations to Plaintiff at the registered email address, and serviced Plaintiff's account through its support, risk, and operations functions during the entire period. Apex addressed Plaintiff by name in correspondence and ticket transcripts and at no point during 2023, 2024, or 2025 raised any concern about Plaintiff's identity, eligibility, or compliance with any rule, written or unwritten.

### E. The July 2025 Ticket #987433 Incident

42. In July 2025, Plaintiff encountered a two-factor-authentication ("2FA") login problem on the Apex platform caused by Apex's own system. Plaintiff opened customer-service Ticket #987433 to resolve the issue. The ticket transcript, which Plaintiff has preserved, reflects a pure technical-support exchange about Plaintiff's inability to receive 2FA codes through Apex's authentication interface. The ticket does not reflect, allege, or document any misconduct on Plaintiff's part.

43. During the course of the July 2025 ticket exchange, Apex support agent "Lizeth" communicated with Plaintiff on multiple occasions. On July 11, 2025, Lizeth expressly invited Plaintiff to return to Apex, stating in substance that Apex valued Plaintiff's continued participation. On July 15, 2025, Lizeth separately advised Plaintiff that Apex had a policy disfavoring multiple accounts. Both communications are documented and preserved. Plaintiff did not at any time conceal his identity or attempt to operate any account in violation of any stated rule.

44. Ticket #987433 closed without any finding of misconduct, with no rule violation cited or alleged, and with no restriction placed on Plaintiff's account. Ticket #987433 is—and was at all times—a technical-support ticket, not a compliance or misconduct file.

**F. The February 2026 Pickleball Fanatics, LLC Account**

45. In February 2026, Plaintiff opened a separate Apex Performance Account in the name of his limited-liability company, Pickleball Fanatics, LLC, with the registered email address support@dinkandlobfl.com (the "Pickleball Fanatics Account"). Plaintiff submitted to Apex's full Know-Your-Customer ("KYC") onboarding process, including identity verification of Plaintiff personally as the responsible principal of Pickleball Fanatics, LLC.

46. Apex KYC-cleared the Pickleball Fanatics Account. Apex then billed the Pickleball Fanatics Account on a recurring monthly basis. Apex collected approximately ten thousand dollars in subscription, evaluation, activation, platform, data, and exchange fees on the Pickleball Fanatics Account between February 2026 and April 2026. Apex supported the Pickleball Fanatics Account through its standard customer-service channels. Apex addressed Plaintiff by name in correspondence concerning the Pickleball Fanatics Account.

47. Apex therefore had actual, contemporaneous knowledge at all relevant times after February 2026 that the Pickleball Fanatics Account was associated with Plaintiff personally as the responsible principal of Pickleball Fanatics, LLC. That knowledge was established through Apex's own KYC process, its own billing, its own correspondence, and its own customer-service interactions.

**G. The April 9–10, 2026 Pretextual Closure**

48. By Trade Day 6 on the Pickleball Fanatics Account, on April 9, 2026, Plaintiff had satisfied every payout-eligibility criterion that Apex itself publishes. The Apex platform displayed an account balance of $168,495.28 and "Eligible" status. Plaintiff preserved a dated screenshot reflecting the "Eligible" status and the $168,495.28 balance.

49. Plaintiff's account satisfied the published Consistency Rule at 36.26%—well within Apex's published 50% maximum-day threshold. No applicable rule, as published by Apex, was violated on the Pickleball Fanatics Account during the Evaluation phase or thereafter.

50. On April 10, 2026, Plaintiff submitted a payout request for the eligible amount through Apex's payout interface.

51. Within hours, on April 10, 2026, Plaintiff received two communications from Apex at 11:14 a.m. EDT—the simultaneity of which, with the same timestamp on both, suggests pre-coordination rather than independent customer-service review:

52. (a) An email from "Hector P." at Apex stating that the Pickleball Fanatics Account had been flagged for "prohibited activity," without specifying the activity, the rule, the evidence, or the basis for the flag; and

53. (b) An email from the Apex "Risk Department" advising Plaintiff that his account had been permanently closed, citing Ticket #987433 and a generalized "Code of Conduct" violation, but identifying no specific rule, no specific conduct, and no factual predicate.

54. Apex thereby retained $18,495.28 in earned trading profits accrued in Plaintiff's account, plus all subscription and other fees previously paid on the Pickleball Fanatics Account. Apex also retained the more than fifty thousand dollars in subscription and other fees that Plaintiff had paid on the original APEX-89613 account from 2023 through 2025.

55. Apex's cited rationale—that Ticket #987433 (a 2FA technical-support ticket from July 2025) supported a "Code of Conduct" closure in April 2026—is pretextual on its face. Ticket #987433 contains no allegation of misconduct. Apex cleared the Pickleball Fanatics Account through KYC in February 2026 with full knowledge of Plaintiff's identity and history. Apex billed and serviced the Pickleball Fanatics Account for two months while addressing Plaintiff by name. Apex's invocation of the July 2025 ticket as grounds for the April 2026 closure was not a good-faith application of Apex's rules—it was the manufactured pretext required to seize a six-figure payout at the moment of submission.

**H. The Skelton Recording**

56. Apex's pretextual payout-denial scheme is not Plaintiff's theory. It has been described, in Apex's own Co-Founder and Chief Operating Officer's own voice, in a

recorded Zoom video conference (the "Skelton Recording") whose existence and content are matters of public record in pending federal litigation.

57. In Riot v. Apex Trader Funding Inc., No. 1:24-cv-01557-ADA (W.D. Tex.), Apex's own counsel, McKool Smith P.C., has stipulated to the existence of the Skelton Recording. The recording was provided on or about January 6, 2024, by Leo Riot—identified in the West-Texas docket as "an Apex founder," Riot v. Apex Trader Funding Inc., Dkt. 70, at 2 (W.D. Tex. Feb. 14, 2025)—to journalist Kelly Ann Marlin.

58. The contents of the Skelton Recording, as characterized in a public filing in that action, are as follows: "In the video, Skelton described measures and rule changes that Apex was going to and ultimately instituted in order to 'attack' their large number of payouts to users and cause psychological distress to Apex traders." Id., Dkt. 70, at 3.

59. On information and belief, Skelton, in the same recording, also stated in substance that he had "tried to tear [profitable traders] apart" and could not. Plaintiff has preserved a copy of the Skelton Recording.

60. Apex's response to the public emergence of the Skelton Recording has been to obtain an Agreed Temporary Restraining Order on January 14, 2025, restraining further public dissemination, Riot v. Apex Trader Funding Inc., Dkt. 31 (W.D. Tex.), and to file a Motion for Contempt seeking sanctions against the persons who lawfully published the recording, id., Dkt. 33. Apex's suppression efforts in West Texas—the same conduct Plaintiff has himself now experienced—are themselves evidence that the contents of the Skelton Recording are damaging admissions and that Apex's payout-denial conduct is a continuing course of business, not a series of isolated administrative decisions.

**I. Demand Letter, Litigation Hold, and Regulatory Complaints**

61. On April 10, 2026, within hours of the pretextual closure, Plaintiff served a Litigation Hold and Evidence Preservation Notice on Apex, addressed to Support, Legal, Chief Executive Officer Darrell Martin, Chief Technology Officer Bryan Wirth, and additional officers and personnel. The notice directed Apex to immediately preserve all

potentially relevant evidence and to suspend any automatic-deletion policies, including with respect to communications, account records, internal notes, ticket transcripts, and copy-trade and master-account data.

62. On April 11, 2026, Plaintiff served a Formal Demand for Payment, Notice of Intent to Commence Federal Litigation, and Notice of Regulatory Complaints, demanding payment of all sums owed and establishing a ten-business-day deadline for compliance.

63. On April 10, 2026, Plaintiff filed a CFTC Whistleblower Complaint (Form TCR, Confirmation No. 2604-1016-4101-52) identifying Apex's principals, documenting the scheme described herein, and referencing the Skelton Recording, the NFA BASIC search results, and the pattern of pretextual closures. A TCR Supplement was subsequently filed to complete certain fields and provide clarifications.

64. None of the recipients of the Litigation Hold has substantively responded to or acknowledged receipt of its preservation directives. Apex's retained counsel, Robert Morris of the Morris Law Group (New Rochelle, NY), subsequently contacted Plaintiff but has not substantively addressed the claims or the demand.

**J. Spoliation: Apex's Post-Hold Lockout**

65. On April 14, 2026—four days after Plaintiff served the Litigation Hold and Evidence Preservation Notice—Plaintiff attempted to log in to his Apex account dashboard for the purpose of preserving and documenting additional records relevant to this dispute, including trade history, ticket transcripts, fee records, and copy-trade data. Apex denied that access. In place of the dashboard, Apex displayed a red banner reading "Fraudulent Activity Detected." Plaintiff has preserved a dated screenshot of that display.

66. Apex's post-hold conduct is independently actionable on multiple grounds. First, branding Plaintiff as a fraudster on Apex's own platform—after Apex was on formal notice of pending litigation, after Plaintiff had filed a CFTC Whistleblower Complaint, and without any specific factual predicate ever provided by Apex—is a deceptive and bad-faith act that supports Plaintiff's FDUTPA, fraud, and punitive-damages claims. Second, denying Plaintiff access to records within Apex's exclusive control, immediately after Apex

was directed to preserve those records, deprived Plaintiff of the ability to access, capture, and preserve evidence that bears directly on the issues in this case—evidence that Apex itself is now the sole custodian of.

67. Plaintiff respectfully reserves the right to seek, and will seek at the appropriate stage of these proceedings, an adverse-inference instruction, evidentiary preclusion, and other appropriate sanctions under Federal Rule of Civil Procedure 37(e) and the Court's inherent authority. *See Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005) (sanctions warranted where party with notice of litigation fails to preserve evidence in its exclusive custody).

**K. Widespread Pattern of Abuse**

68. Plaintiff's experience is not isolated. Tens of thousands of documented complaints from traders are available across social-media platforms including Reddit, Trustpilot, Discord, and Facebook, describing substantially similar patterns: arbitrary rule changes, withheld payouts, technical failures blamed on traders, and inadequate dispute resolution. In May 2025 alone, Apex banned an enormous number of profitable traders in a mass purge that has been widely documented on social media. This widespread pattern is consistent with a business model that functions as a subscription-based scheme designed to continuously extract fees while systematically denying payouts.

**L. Comparative Industry Conduct: TopStep's Post-Complaint Restructuring and Registration Activity Versus Apex's Continued Defiance**

69. The structural questions presented by Apex's business are not novel. A sister proprietary-trading enterprise, the Topstep group of companies, is the subject of a parallel federal action by Plaintiff before the same District Judge and Magistrate Judge: McCrudden v. TopstepFunded LLC, et al., Case No. 3:26-cv-00816-WWB-LLL (M.D. Fla., Jacksonville Division).

70. Following Plaintiff's March 23, 2026 CFTC complaint, NFA complaint, and formal demand letter to Topstep, public records of the National Futures Association, the Commodity Futures Trading Commission, and contemporaneous corporate

announcements reflect a tightly clustered pattern of corporate-restructuring and CFTC/NFA registration activity by the Topstep enterprise:

71. (a) On April 1, 2026—nine days after Plaintiff's CFTC complaint, NFA complaint, and formal demand letter—Topstep publicly announced its acquisition of The Futures Desk ("TFD"), a previously independent proprietary futures trading firm founded in 2024 by Josh Schwartzberg. The acquisition brought TFD's co-founders Josh Schwartzberg and Brian Ford into the Topstep enterprise and integrated TFD's trading technology directly into Topstep's TopstepX platform. A search of the NFA Background Affiliation Status Information Center ("BASIC") database returned no current or historical registration for The Futures Desk or for Josh Schwartzberg in any CFTC- or NFA-regulated capacity. The acquisition was not a registration step or compliance measure; it was a corporate consolidation that brought an unregistered proprietary-trading firm, founded and operated by an unregistered principal, into the Topstep corporate group, and that preceded by two days the cosmetic CTA-registration application described in subparagraph (b) below.

72. (b) On April 3, 2026—eleven days after Plaintiff's regulatory complaints—Topstep Advisory LLC filed an NFA application for Commodity Trading Advisor ("CTA") registration, NFA Membership, and Swap Firm status.

73. (c) On April 6, 2026, Christopher Aaron Darak was approved as a Principal of Topstep Advisory LLC.

74. (d) On April 17, 2026, Topstep Advisory LLC was approved as an NFA Member and registered as a CTA.

75. (e) On April 23, 2026, Topstep Chief Executive Officer Michael Patak was approved as an Associated Person, NFA Associate Member, and Principal at Topstep Advisory LLC.

76. (f) On April 27, 2026, Topstep Holdings LLC was added as a Principal at Topstep Advisory LLC, and approved as such on April 29, 2026.

77. (g) Between April 30 and May 5, 2026, multiple Topstep principals were approved as Swap Associated Persons at Topstep Brokerage LLC.

78. (h) On May 2, 2026, Topstep Advisory LLC obtained Swap Firm registration approval.

79. Plaintiff does not contend that Topstep's CTA registration is sufficient to cure the violations alleged in the Topstep action. A CTA registration does not authorize the operation of a commodity pool, does not satisfy the Commodity Pool Operator registration requirement of 7 U.S.C. § 6m, and does not cure the violation alleged in Count I of this Complaint. The Topstep CTA registration is either cosmetic or the first step in a multi-step restructuring whose subsequent steps must be expected, anticipated, and preserved against in real time.

80. What the Topstep activity does establish, however, is that an industry actor with comparable structural exposure has, at minimum, taken visible steps in apparent response to Plaintiff's regulatory complaints. Apex, by contrast, has taken no comparable step at all. Apex has filed no NFA application. Apex has registered no entity in any capacity. Apex has approved no principal under NFA registration. Apex has substantively responded to neither the Litigation Hold nor the Formal Demand. Apex's continued, deliberate, post-complaint defiance of the CEA registration regime—while a similarly situated competitor at least pursues the formal trappings of compliance—supports the inference of willful, knowing, and ongoing violation rather than oversight or mistake.

81. The MyForexFunds enforcement matter (CFTC v. Traders Global Group, Inc., No. 23-cv-04665, D.N.J.), in which the CFTC alleged a substantially identical proprietary-trading-firm pool structure, was dismissed on procedural grounds arising from CFTC litigation conduct; the substantive structural allegations were never tested or adjudicated on the merits. Those substantive concerns remain live, and the issues here are not addressed or resolved by the procedural disposition of MyForexFunds.

## V. CAUSES OF ACTION

**Count I: Operation of an Unregistered Commodity Pool**

**(7 U.S.C. §§ 6m, 6o)**

**(All Defendants)**

82. Plaintiff incorporates by reference paragraphs 1 through 81 as if fully set forth herein.

83. The Commodity Exchange Act requires any person operating a commodity pool to register as a Commodity Pool Operator with the CFTC and become a member of the NFA. 7 U.S.C. § 6m(1). A "commodity pool" is "any investment trust, syndicate or similar form of enterprise operated for the purpose of trading commodity interests." 17 C.F.R. § 4.10(d)(1). A "commodity pool operator" is any person engaged in such an enterprise who "solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests." 7 U.S.C. § 1a(11).

84. Apex's own Agreement and business structure establish that Apex operates a commodity pool: (1) the Agreement provides that Apex "may set up a copy trade account to copy trader's trades from SIM account at any ratio with or without notice in a Live Account held by the Company," such that multiple traders' accounts feed into a master trading account controlled by Apex; (2) Apex solicits and receives funds from traders in the form of subscription fees, commissions, exchange fees, data fees, and a percentage share of trading profits; (3) these funds flow into a pooled structure in connection with which Apex markets, advertises, and represents futures-contract trading on regulated exchanges (CME, CBOT, COMEX, NYMEX), with the actual venue of execution being a question of fact reserved for discovery; and (4) traders' compensation is calculated as a proportionate allocation of "Trading Profits"—the hallmark of a pooled investment structure.

85. Apex is not registered with the CFTC or NFA as a Commodity Pool Operator. A search of the NFA's Background Affiliation Status Information Center ("BASIC") database returned no current or historical registration for Apex Trader Funding, Inc., Apex Investing Institute, Darrell Roland Martin, John Mark Skelton, Bryan Wirth, or

Anthony Todd Johnson in any CFTC- or NFA-regulated capacity. Apex will argue that it is engaged in "proprietary trading" for its own account and risk. But this characterization is a legal fiction. Apex does not fund its trading from its own capital alone; it solicits funds from thousands of traders through subscription fees and profit-sharing, combines those funds, and allocates profits and losses to individual trader sub-accounts. This is precisely the activity the CPO registration requirement was designed to regulate.

86. The failure to register as a CPO is not a mere technical violation. CPO registration imposes critical protections for pool participants, including mandatory disclosure documents, periodic reporting to the NFA, segregation of pool-participant funds, restrictions on commingling, and fiduciary obligations to pool participants. Apex's failure to register enables it to operate without these protections—withholding account statements, modifying rules unilaterally, and seizing trader capital—precisely the abuses that CPO registration is designed to prevent. *See CFTC v. Equity Financial Group, LLC*, No. 1:04-cv-01512-RBK-AMD (D.N.J. Feb. 4, 2008) (Kugler, J.) (finding defendants operated unregistered commodity pools and aided and abetted CPO violations); *CFTC v. Aureus Revenue Group LLC*, No. 6:24-cv-01603 (M.D. Fla. filed Sept. 4, 2024) (pending enforcement action in this District against alleged unregistered Florida CPO and its CEO, with controlling-person allegations under 7 U.S.C. § 13c(b)).

87. This Court has had occasion to enforce the CEA's CPO and antifraud provisions in this District. *See CFTC v. Fintech Investment Group, Inc., Compcoin LLC and Alan Friedland*, No. 6:20-cv-652-Orl-WWB-EJK (M.D. Fla. Mar. 24, 2022), Doc. 154-1 (Berger, J.) (Consent Order entering Findings of Fact and Conclusions of Law that defendants violated, *inter alia*, 7 U.S.C. § 6o(1)(A) and (B), 7 U.S.C. § 9(1), 17 C.F.R. § 180.1, and 7 U.S.C. § 13c(a)); *CFTC v. Fundsz, Inc.*, No. 6:23-cv-01445-WWB-DCI (M.D. Fla. Aug. 2, 2023), Doc. 11 (Berger, J.) (ex parte statutory restraining order pleading violations of 7 U.S.C. §§ 1–26 and 17 C.F.R. § 180.1).

88. Eleventh Circuit precedent confirms that unregistered CPO operation and pool-fund commingling are independently actionable. *See CFTC v. Amerman*, 645 F. App'x 938 (11th Cir. 2016) (per curiam) (unpublished) (affirming summary judgment that defendant operated as an unregistered commodity pool operator and commingled pool

property); *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321 (11th Cir. 2002) (appeal from M.D. Fla.) (CEA designed to protect market participants from deceptive solicitation practices).

89. Each Individual Defendant, as a controlling person within the meaning of 7 U.S.C. § 13c(b), is jointly and severally liable for Apex's operation of an unregistered commodity pool. Each personally directed, authorized, participated in, or knowingly permitted the conduct underlying the violation, including the marketing and solicitation of funds, the design and maintenance of the master trading account structure, and the failure to register.

**Count II: Fraud and Manipulation Under the CEA**

**(7 U.S.C. § 9(1); 17 C.F.R. § 180.1)**

**(All Defendants)**

90. Plaintiff incorporates by reference paragraphs 1 through 81 as if fully set forth herein.

91. The CEA's anti-fraud provisions prohibit any person from employing any manipulative or deceptive device or contrivance in connection with any swap, contract of sale of any commodity in interstate commerce, or contract for future delivery. 7 U.S.C. § 9(1); 17 C.F.R. § 180.1.

92. The Eleventh Circuit has articulated a three-element test for CEA fraud liability: (1) the making of a misrepresentation, misleading statement, or deceptive omission; (2) scienter; and (3) materiality. *CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 977 (11th Cir. 2014); *see also CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1332 (11th Cir. 2002) (materiality is satisfied where a reasonable investor would consider the information important in making an investment decision).

93. Under Federal Rule of Civil Procedure 9(b), "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

Fed. R. Civ. P. 9(b). This pleading standard governs the allegations of scienter for CEA fraud claims set forth herein.

94. Apex's conduct constitutes fraud and manipulation in multiple respects. First, Apex markets funded trading accounts while systematically altering rules to prevent payouts—a classic scheme to defraud. Second, Apex's Agreement authorizes it to "revise policies and terms . . . at any time without notice," enabling it to change the rules after traders have invested time and money. Third, Apex's own Co-Founder and Chief Operating Officer, John Mark Skelton, described on video the company's strategy for finding pretextual justifications to deny payouts to profitable traders—direct evidence of fraudulent intent. Fourth, Apex's deliberate withholding of comprehensive account statements prevents traders from detecting and documenting the fraud. Fifth, Apex's confidentiality clause operates to suppress reporting of the scheme. Sixth, Apex's post-hold display of "Fraudulent Activity Detected" against an account it itself had KYC-cleared and billed for two months is a deceptive act undertaken to manufacture a false justification for the closure and to chill regulatory and litigation reporting.

95. The statutory provisions invoked here have been the subject of substantive judicial findings in this District. *See CFTC v. Fintech Investment Group, Inc.*, No. 6:20-cv-652-Orl-WWB-EJK (M.D. Fla. Mar. 24, 2022), Doc. 154-1 (Berger, J.) (Findings of Fact and Conclusions of Law that defendants violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1); *CFTC v. Fundsz, Inc.*, No. 6:23-cv-01445-WWB-DCI (M.D. Fla.) (Berger, J.) (pleading and enforcing the same Section 9(1) and Regulation 180.1 framework).

96. Each Individual Defendant, as a controlling person within the meaning of 7 U.S.C. § 13c(b), is jointly and severally liable for Apex's violations of the CEA's anti-fraud provisions.

**Count III: Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing**

**(Apex)**

97. Plaintiff incorporates by reference paragraphs 1 through 81 as if fully set forth herein.

98. A breach of contract claim under Florida law requires: (1) a valid contract; (2) a material breach; and (3) resulting damages. *Friedman v. New York Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. 4th DCA 2008).

**1. Apex Breached the Agreement.**

99. Apex's own system confirmed that Plaintiff satisfied every published payout-eligibility criterion. The Agreement provides that traders who meet these criteria are "entitled to 100% of the first $25,000 they withdrawal." Apex's closure of the account at the moment of payout submission, on pretextual grounds having nothing to do with trading performance, constitutes a willful breach of the contractual promise that traders who satisfy the published criteria will receive payouts.

**2. Apex Breached the Implied Covenant of Good Faith and Fair Dealing.**

100. Florida law implies a covenant of good faith and fair dealing into every contract. Apex's invocation of a 2025 technical-support ticket as the supposed basis for a 2026 "Code of Conduct" closure—after Apex had KYC-cleared the account, billed it for two months, addressed Plaintiff by name, and confirmed his payout eligibility—is not the conduct of a counterparty acting in good faith. The simultaneous 11:14 a.m. timestamps on Apex's "prohibited activity" email and "permanent closure" email confirm that the closure was pre-coordinated rather than the product of independent customer-service review. Apex's exercise of discretion was undertaken in bad faith, frustrated the reasonable contractual expectations of the parties, and violated the implied covenant.

**Count IV: Fraudulent Inducement**

**(All Defendants)**

101. Plaintiff incorporates by reference paragraphs 1 through 81 as if fully set forth herein.

102. Apex's public marketing representations—including but not limited to "NO Payout Denials," "Simple Rules. No Gray Area. No 'Interpretation' of rules," "No Gimmicks. No Hidden Rules," "5 Trading Days. No denied payouts," and the representation that traders meeting published criteria are "entitled to 100% of the first

$25,000"—are statements of material fact upon which Plaintiff relied to his detriment when paying subscription, evaluation, activation, platform, data, and exchange fees on both the APEX-89613 account (since 2023) and the Pickleball Fanatics Account (since February 2026).

103. These representations were untrue when made. Apex's own Co-Founder and Chief Operating Officer's recorded description of Apex's strategy to "attack" its large number of payouts establishes that Apex's leadership knew, at the time the representations were made, that Apex did not in fact honor its published rules, did not in fact pay out without denial, and did in fact deploy interpretation, gray-area discretion, and hidden mechanisms to deny payouts to profitable traders. The representations were made with the intent that Plaintiff and similarly situated traders rely on them in paying fees.

104. Plaintiff reasonably relied on these representations in paying more than fifty thousand dollars in fees on his original account over more than three years, and approximately ten thousand dollars in fees on the Pickleball Fanatics Account over more than two months. Had Plaintiff known that Apex's public representations were untrue and that Apex would deploy pretextual closures at the moment of payout eligibility, Plaintiff would not have paid the fees, would not have entered into the agreements, and would not have traded on Apex's platform.

105. Each Individual Defendant participated in, authorized, directed, or knowingly permitted the dissemination of the false representations and is personally liable for fraudulent inducement.

**Count V: Violations of the Florida Deceptive and Unfair Trade Practices Act**

**(Fla. Stat. §§ 501.201 et seq.)**

**(All Defendants)**

106. Plaintiff incorporates by reference paragraphs 1 through 81 as if fully set forth herein.

107. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. Fla. Stat. § 501.204(1).

108. Apex's conduct, as alleged herein, constitutes unfair and deceptive trade practices within the meaning of FDUTPA. The actionable conduct includes, without limitation: (a) the dissemination of categorical marketing representations ("NO Payout Denials," "No Gray Area," "No Hidden Rules") that Apex's own Co-Founder and Chief Operating Officer's recorded statements demonstrate to be false; (b) the design and deployment of pretextual closure mechanisms triggered at the moment of payout eligibility; (c) the manufacture of after-the-fact "Code of Conduct" justifications based on technical-support tickets unrelated to misconduct; (d) the post-litigation-hold display of a "Fraudulent Activity Detected" banner against an account that Apex itself had KYC-cleared and billed for two months; (e) the maintenance of corporate opacity through a UPS Store mailbox address and the absence of any NFA registration; and (f) the operation of a commodity pool without the consumer-protection disclosures and protections that CPO registration would require.

109. Plaintiff is a "consumer" within the meaning of FDUTPA. Plaintiff has suffered actual damages as a direct and proximate result of Apex's unfair and deceptive trade practices, including the loss of $18,495.28 in earned trading profits, the loss of approximately ten thousand dollars in subscription fees paid on the Pickleball Fanatics Account, the loss of more than fifty thousand dollars in subscription fees paid on the original APEX-89613 account, and consequential damages.

110. Plaintiff is entitled to actual damages, attorneys' fees, and costs under Fla. Stat. § 501.211.

**Count VI: Conversion**

**(All Defendants)**

111. Plaintiff incorporates by reference paragraphs 1 through 81 as if fully set forth herein.

112. Conversion under Florida law is the wrongful exercise of dominion over the property of another to the exclusion of the owner's rights. Plaintiff held a possessory right to the $18,495.28 in earned trading profits accrued in the Pickleball Fanatics Account upon satisfaction of the published payout-eligibility criteria. Apex's seizure of those funds, at the moment of payout submission and on pretextual grounds, constitutes conversion.

113. Plaintiff has demanded the return of the converted funds; Apex has refused. Plaintiff is entitled to the value of the converted property, plus prejudgment interest and, where willful, punitive damages.

**Count VII: Unjust Enrichment**

**(Apex)**

114. Plaintiff incorporates by reference paragraphs 1 through 81 as if fully set forth herein.

115. Plaintiff conferred substantial benefits on Apex, including more than fifty thousand dollars in subscription and other fees on the original account from 2023 through 2025, approximately ten thousand dollars in subscription and other fees on the Pickleball Fanatics Account from February through April 2026, and the $18,495.28 in earned trading profits retained by Apex following the pretextual closure. Apex knowingly accepted and retained these benefits. Under the circumstances alleged herein, it would be inequitable for Apex to retain those benefits without paying their value to Plaintiff.

**Count VIII: Breach of Fiduciary Duty**

**(All Defendants)**

116. Plaintiff incorporates by reference paragraphs 1 through 81 as if fully set forth herein.

117. By operating an unregistered commodity pool, by pooling trader funds in a master account structure, by exercising discretion over the disposition of those funds, and by undertaking the obligations of an entity that solicits funds from the public for purposes of commodity-interest trading, Apex acted as a fiduciary with respect to Plaintiff and

similarly situated traders. Apex breached its fiduciary duties by, among other things: seizing earned profits on pretextual grounds; failing to provide comprehensive account statements; concealing material facts about its operations; suppressing reporting of payout denials through confidentiality clauses; and operating without the disclosures and protections that CPO registration would have required.

**Count IX: Unconscionability**

**(Apex)**

118. Plaintiff incorporates by reference paragraphs 1 through 81 as if fully set forth herein.

119. Florida law applies a sliding-scale analysis to unconscionability claims, considering both procedural and substantive unconscionability. *See Basulto v. Hialeah Auto.*, 141 So. 3d 1145 (Fla. 2014). The more substantively unconscionable a contract's terms, the less procedural unconscionability is required.

120. The Apex Agreement is procedurally unconscionable as a contract of adhesion drafted by Apex and presented to Plaintiff on a take-it-or-leave-it basis as a non-negotiable condition of accessing the trading capital Plaintiff was paying to access. There was no meaningful opportunity to negotiate any term.

121. The Agreement is substantively unconscionable in multiple, independent respects. The following terms of the Agreement satisfy that standard independently and cumulatively: (1) unlimited unilateral discretion to close accounts and seize all funds; (2) the right to revise all policies and terms at any time without notice; (3) the confidentiality clause functioning as a gag order against trader complaints, regulatory cooperation, and collective redress; (4) the limitation-of-liability clause capping Apex's exposure at the amount paid by Trader, even where Apex has seized far larger sums in earned profits; (5) the "no refunds" policy; and (6) the forfeiture provisions permitting seizure of all funds for any breach, real or manufactured. Under the Basulto sliding-scale framework, the extreme one-sidedness of these substantive terms requires only modest evidence of procedural unconscionability—a threshold that the take-it-or-leave-it adhesion-contract circumstances of formation easily satisfy.

**Count X: Controlling-Person Liability Under 7 U.S.C. § 13c(b)**

**(All Individual Defendants)**

122. Plaintiff incorporates by reference paragraphs 1 through 81 as if fully set forth herein.

123. Section 13c(b) of the CEA provides for controlling-person liability for any person who, directly or indirectly, controls any person who has violated any provision of the CEA or rules thereunder. 7 U.S.C. § 13c(b). Courts have applied analogous controlling-person principles in private actions arising under Section 22 of the CEA, 7 U.S.C. § 25. *Cf. CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002) (interpreting § 13c(b) broadly in CFTC enforcement context).

124. Each Individual Defendant—Darrell Roland Martin (CEO and Founder), Bryan Wirth (CTO), John Mark Skelton (Co-Founder and COO), Anthony Todd Johnson (Chief of Staff), Daniel Cook (CMO/CSO), Cris Manning (EVP Operations), Cameron Nish (Director of Marketing), and Vince Koehn (Business Development Manager)—is, upon information and belief, a controlling person of Apex within the meaning of 7 U.S.C. § 13c(b). Each personally directed, authorized, participated in, or knowingly permitted the conduct underlying Counts I and II, including the unregistered operation of a commodity pool, the marketing of trading programs that the Agreement's own terms render illusory, the design and implementation of the pretextual closure mechanism, the suppression of trader complaints through the confidentiality clause, and (with respect to those involved in the April 10–14, 2026 events) the post-litigation-hold lockout.

125. Each Individual Defendant is therefore jointly and severally liable with Apex for the violations of the CEA pleaded in Counts I and II, in addition to any independent liability arising under Florida law for personal participation in tortious conduct. *See White v. Mund*, 670 So. 2d 1038, 1039 (Fla. 4th DCA 1996).

## VI. CONCLUSION AND PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff respectfully submits that this Court has jurisdiction over this action under both diversity and federal-question jurisdiction; that the

Agreement's forum-selection, arbitration, jury-waiver, confidentiality, and limitation-of-liability clauses are unconscionable and unenforceable; and that the facts and law establish meritorious claims against all Defendants for operation of an unregistered commodity pool, fraud and manipulation under the CEA, breach of contract, fraudulent inducement, violations of the Florida Deceptive and Unfair Trade Practices Act, conversion, unjust enrichment, breach of fiduciary duty, unconscionability, and controlling-person liability.

Plaintiff respectfully requests the following relief:

1. A declaration that Apex Trader Funding, Inc. operates an unregistered commodity pool in violation of 7 U.S.C. §§ 6m and 6o and that each Individual Defendant is a controlling person jointly and severally liable under 7 U.S.C. § 13c(b);

2. A declaration that the Agreement's arbitration clause, forum-selection clause, jury-waiver provision, confidentiality clause, and limitation-of-liability clause are unconscionable and unenforceable;

3. Compensatory damages including all subscription, evaluation, activation, platform, data, and exchange fees paid in excess of $50,000 over more than three years on the original account; approximately $10,000 in subscription fees paid on the Pickleball Fanatics, LLC account; the $18,495.28 in seized trading profits; lost trading profits; and consequential damages;

4. Punitive damages for Defendants' willful, wanton, and fraudulent conduct, including the post-litigation-hold display of a "Fraudulent Activity Detected" banner against Plaintiff's account;

5. Statutory damages, attorneys' fees, and costs under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.211;

6. Injunctive relief ordering Defendants to: (a) immediately release Plaintiff's $18,495.28 in seized funds; (b) register as a Commodity Pool Operator or cease operations; (c) cease the practice of selling or sharing trader data to institutions that trade

against its own traders; (d) provide full and transparent account statements to all traders; and (e) rescind the confidentiality clause as applied to truthful statements;

7. Disgorgement of all ill-gotten gains derived from Defendants' operation of the unregistered commodity pool;

8. Pre-judgment and post-judgment interest as allowed by law; and

9. Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury on all issues so triable.

Dated: May 31, 2026

Respectfully submitted,

/s/ Vincent McCrudden
VINCENT McCRUDDEN
Plaintiff, Pro Se
31 Flyer Circle
Saint Johns, Florida 32259
(646) 220-9900
vmccrudden@gmail.com

## CERTIFICATION REGARDING USE OF GENERATIVE ARTIFICIAL INTELLIGENCE

Pursuant to the Standing Order of the Hon. Wendy W. Berger dated April 2, 2026, the undersigned hereby certifies that generative artificial intelligence was used in the preparation of portions of this filing. The undersigned further certifies that he has personally reviewed every citation, factual assertion, and legal proposition contained in this filing and has independently confirmed that each citation exists, accurately reflects

the holding cited, and supports the proposition for which it is offered; and that the undersigned takes full responsibility for the content of this filing.

/s/ Vincent McCrudden
VINCENT McCRUDDEN

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the date set forth above, the foregoing Second Amended Complaint was filed with the Clerk of the Court for the United States District Court for the Middle District of Florida by U.S. Mail, and that a true and correct copy was served by electronic mail upon counsel of record by mutual consent pursuant to Federal Rule of Civil Procedure 5(b)(2)(E):

Robert W. Morris, Esq.
Morris Law Group
35 Longvue Avenue
New Rochelle, NY 10804
rmorris@morris-lawgroup.com

Travis E. DeArman, Esq.
Brad Jarrett, Esq.
McKool Smith, P.C.
300 Crescent Court, Suite 1200
Dallas, TX 75201
tdearman@mckoolsmith.com
bjarrett@mckoolsmith.com

/s/ Vincent McCrudden
VINCENT McCRUDDEN